UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Jeffrey Wilson,<br><br>　　　Petitioner<br><br>v.<br><br>State of Nevada, et al.,<br><br>　　　Respondents | Case No.: 2:19-cv-00549-JAD-DJA<br><br>**Order Denying Petition for a<br>Writ of Habeas Corpus and Denying<br>Certificate of Appealability**<br><br>[ECF No. 1-1] |

　　　Jeffrey Wilson pled guilty in Nevada state court to second degree murder with use of a deadly weapon and attempted murder.[1] Wilson now petitions for a writ of habeas corpus under 28 U.S.C. § 2254, arguing that his trial counsel was ineffective resulting in an invalid plea.[2] Having evaluated the merits of his claim, I find that habeas relief is not warranted, so I deny Wilson's petition, deny him a certificate of appealability, and close this case.

## Background

**I.　The facts underlying Wilson's conviction**[3]

　　　On June 27, 2012, at 4:43 a.m., Wilson's father and mother, William and Kathryn Wilson were both shot while inside their car in the driveway of their home. The shooter fired multiple shots through the driver's side of the vehicle. Kathryn was in the passenger seat and died from her injuries at the scene. William was shot several times but was found conscious and alert on the ground when officers arrived. William told responding officers that he did not see who shot

---

[1] ECF No. 19-8.

[2] ECF No. 34.

[3] These facts are taken from the officer's report and arrest report attached to the State's response to Wilson's supplemental state habeas petition. ECF No. 20-9. For simplicity's sake, I cite to this exhibit generally for the entire background section.

him, but he also informed them that he had an argument with his son about auto parts for a van.[4] After their argument, Wilson stayed at a hotel, Arizona Charlie's, approximately one mile from his parents' home. William stated that "[Wilson] could have done something like this." William informed the police that Wilson had access to the safe inside his home, there were several handguns and rifles inside the safe, and Wilson drove a white Ford panel van.

Police recovered seven 40-caliber casings and a 9mm cartridge from the driveway's south edge. Glass fragments, blood spatter, and blood smear covered the interior of the car. A pickup truck was parked on the north end of the driveway. In the truck's front seat, police found a surveillance camera with the front lens broken off and wires that were cut or pulled apart. Cables along the house leading to a recording device had been removed, cut, and pulled apart, and the recording device was missing.

Police located Wilson's van less than a mile from the scene. In it, they found a surveillance camera like the disabled one found at the scene, along with its mounting bracket that appeared to have been pulled out of a wall. They also found a Glock 40-caliber-pistol magazine with five 40-caliber Smith and Weston cartridges in the magazine—the same type as those found at the scene.[5]

Detectives located Wilson at Arizona Charlie's with his girlfriend, Bobbie Bellomy, and their two children. Bellomy told detectives that Wilson called her the day before the shooting and told her that his parents rented him a room. She met Wilson at the room with their sons. Around 1:00 a.m., Wilson left for about an hour. He left the room again at about 4:09 a.m.,

---

[4] That June, officers were dispatched to William and Kathryn's residence numerous times following domestic-disturbance calls about incidents between Wilson and his parents.

[5] Two weeks before the shooting, a police officer stopped Wilson's van in a routine traffic stop. The officer found three handguns in the car—all of which were lawfully registered to Wilson—including a Glock 40-caliber pistol.

telling Bellomy that he was going to the store. Wilson returned at about 4:50 a.m. and told her that his van broke down. A short time later, he asked to borrow her car to go to his storage unit. When detectives informed Bellomy that Wilson's parents had been shot and that detectives believed he was responsible, she told them that Wilson had been using a lot of methamphetamine recently and that he was becoming increasingly irrational and paranoid. She stated that Wilson told her that he thought his parents were trying to poison him.

Detectives searched Wilson's storage unit and recovered 9mm and 40-caliber cartridges consistent with the casings and cartridges recovered at the scene. They also found a security-system-recording unit with cable pieces attached. Detectives also searched Bellomy's car and found several items of clothing, including a gray shirt, a dark-blue shirt, a blue-and-gray plaid pair of shorts, and a ball cap. Surveillance footage from Arizona Charlie's shows Wilson leaving the property at 1:58 a.m., and a person that appears to be Wilson returns at 4:58 a.m. wearing dark shorts and a white tank top t-shirt. Detectives examined the clothing that Wilson was wearing at the time of his arrest. There were no obvious signs of blood on the clothing, but the clothing had numerous fragments of glass and powdered glass consistent with gunfire blow back.

On June 29, 2012, housekeeping serviced the room in which Wilson was staying. While cleaning, the attendant noticed that the exhaust-fan cover was off. Hotel maintenance inspected the fan to fix it and found a partial frame for a Glock handgun inside. Detectives retrieved the handgun, ran the serial number, and discovered that the handgun was registered to William.

Police then interviewed William and Kathryn's neighbors and friends. Neighbor Josephine Gutierrez heard several gunshots; looked out her window; and saw a heavy-set, approximately 5'8", light-skinned, short-haired man wearing a white or grey t-shirt running. Neighbor Beatriz Flores heard four gunshots; looked out her window; and saw a white,

approximately six-foot-tall, man with light-brown hair and a medium build wearing a white t-shirt standing at the passenger side of a white car in the middle of the street. She saw the man look inside the vehicle and then run southbound. Flores did not see the man's face, but at first, she thought it was Wilson.

Neighbor Christopher Hopkins heard his dog barking around 4:00 a.m. He went outside and saw a six-foot-tall, blond, white man in his early twenties wearing a dark ball cap and white t-shirt and loitering on the sidewalk across the street. Hopkins did not believe it was Wilson. Neighbor Anjalina Cozart woke up to the sound of a police helicopter around 4:30 a.m., observed a police car drive by, and heard three gunshots. She saw a man running past her house and described him as white or Hispanic; in his early twenties; and wearing a dark ball cap, a baby blue t-shirt, and baggy jean shorts. Cozart said that Wilson was not the man who ran past her house.

Detectives interviewed Lee Cagley, a friend to William and Kathryn for 30 years and Kathryn's former employer. Cagley told the police he and William were together when Kathryn called the latter in a panic because Wilson had threatened her life. Cagley stated that Kathryn had begun to lock her office door out of fear that Wilson would show up at her workplace. Finally, detectives also interviewed Karen Mangual, who had been friends with William and Kathryn for 28 years. Mangual stated that Wilson had been threatening his parents and that Kathryn was afraid to be home alone with him. Kathryn would hide in parking lots when Wilson was in the house and began to carry their extra weapons, ammunition, and jewelry in her trunk to keep them away from Wilson. Kathryn had also asked Mangual to hold onto weapons, ammunition, and jewelry on her behalf.

## II. Procedural history

Wilson was charged with murder with use of a deadly weapon, attempted murder with use of a deadly weapon, battery with use of a deadly weapon, and discharging a firearm at or into a structure or vehicle.[6] Public defender Charles Cano represented him in the early stages of the prosecution. Wilson waived his preliminary hearing.[7] Following a June 10, 2013, guilty-plea agreement and plea colloquy, Wilson entered an *Alford*[8] guilty plea as to the second-degree-murder-with-use-of-a-deadly-weapon charge and a reduced attempted-murder charge.[9]

Wilson asked Cano to move to withdraw his guilty plea.[10] Cano instead moved to withdraw as Wilson's counsel and requested that the state court appoint counsel to allow Wilson to pursue his claims challenging his guilty plea.[11] The state appointed Mace Yamplosky to represent Wilson. Yamplosky filed a motion asserting that, based on his review of the case, there was an insufficient legal basis to withdraw the plea, but Wilson insisted that a motion be brought prior to his sentencing hearing.[12] The state court set the matter for hearing and Wilson requested withdrawal of his plea on the basis that he was under the influence of psychiatric medication that affected his decision-making and because counsel rendered ineffective assistance.[13] The state court denied Wilson's request to withdraw his guilty plea[14] and entered a

---

[6] ECF No. 18-4.
[7] ECF No. 18-3.
[8] *North Carolina v. Alford*, 400 U.S. 25 (1970).
[9] ECF No. 18-30; ECF No. 18-31.
[10] ECF No. 19-1 at 3.
[11] *Id*. at 3–4.
[12] ECF No. 19-2.
[13] ECF No. 19-5 at 3.
[14] *Id*. at 4.

judgment of conviction sentencing Wilson to 10 years to life for second-degree murder, 96 to 240 months for use of a deadly weapon, and 96 to 240 months for attempted murder—all of which were to be served consecutively.[15]

Wilson appealed, but the Nevada Supreme Court affirmed his conviction.[16] Wilson then filed a state petition for a writ of habeas corpus.[17] The state court appointed counsel and Wilson requested additional funds to hire a private investigator.[18] Following an evidentiary hearing, the court denied his petition.[19] Wilson appealed that decision as well.[20] The appellate court appointed counsel for Wilson, but he moved to dismiss counsel and to strike his opening brief and the appellate court granted his requests.[21] Wilson proceeded pro se for the remainder of the proceedings, and the Nevada Supreme Court affirmed the denial of habeas relief.[22] Wilson timely filed a pro se federal habeas petition.[23] I granted Wilson's motion for appointment of counsel, and Wilson filed a first-amended federal habeas petition.[24]

---

[15] ECF No. 19-8.

[16] ECF No. 19-18; ECF No. 19-23.

[17] ECF No. 19-26. He also filed two supplemental state habeas petitions. ECF No. 20-6; ECF No. 20-8.

[18] ECF No. 20-5.

[19] ECF No. 20-13; ECF No. 20-14; ECF No. 20-17.

[20] ECF No. 20-30.

[21] ECF No. 20-26; ECF No. 20-28.

[22] ECF No. 20-34.

[23] ECF No. 7.

[24] ECF No. 27; ECF No. 34.

**Discussion**

**I.      Legal standards**

      **A.      Review under the Antiterrorism and Effective Death Penalty Act (AEDPA)**

If a state court has adjudicated a habeas-corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[25] A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[26] And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[27] AEDPA does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[28] The "objectively unreasonable" standard is difficult to satisfy;[29] "even 'clear error' will not suffice."[30]

---

[25] 28 U.S.C. § 2254(d).

[26] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[27] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

[28] *Id.* at 424–26.

[29] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[30] *Woods v. Donald*, 575 U.S. 312, 315–17 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[31] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[32]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief is precluded.[33] AEDPA "thus imposes a 'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[34] If a federal district court finds that the state court committed an error under the act, the district court must then review the claim de novo.[35] The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[36] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[37]

### B.   Ineffective-assistance-of-counsel (IAC) standard

The Sixth Amendment guarantees "the right to the effective assistance of counsel."[38] Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render

---

[31] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[32] *Id.* at 103.

[33] *Id.* at 101.

[34] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[35] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[36] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[37] 28 U.S.C. § 2254(e)(1).

[38] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

8

'adequate legal assistance[.]'"[39] In the hallmark case of *Strickland v. Washington*, the Supreme Court held that an IAC claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[40] However, the court need not "address both components of the inquiry" if the petitioner "makes an insufficient showing on one."[41]

A reasonable probability is "probability sufficient to undermine confidence in the outcome."[42] Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[43] "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."[44] The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[45]

When an IAC claim is pled in the context of a guilty plea, the *Strickland*-prejudice prong requires a petitioner to demonstrate "there is a reasonable probability that, but for counsel's

---

[39] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).
[40] *Strickland*, 466 U.S. at 690, 694.
[41] *Id.* at 697.
[42] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).
[43] *Strickland*, 466 U.S. at 689.
[44] *Harrington*, 562 U.S. at 104.
[45] *Id.*

errors, [the petitioner] would not have pled guilty and would have insisted on going to trial."[46] As the Supreme Court observed in *Hill v. Lockhart*:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenge to convictions obtained through a trial. For example, [if] the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the [petitioner] by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.[47]

The Supreme Court has described federal review of a state appellate court's decision on an IAC claim as "doubly deferential."[48] So, the court must "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d)'"[49] and consider only the record that was before the state court that adjudicated the claim on its merits.[50]

## II. Wilson isn't entitled to federal habeas relief.

Wilson alleges that his counsel, Cano, rendered ineffective assistance resulting in an invalid plea because counsel failed to adequately investigate the case before Wilson entered that plea.[51] Postconviction counsel retained a private investigator[52] who discovered that there were potential alternate suspects:

---

[46] *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).
[47] *Id.*
[48] *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).
[49] *Id.*
[50] *Id.* at 181–84.
[51] ECF No. 34 at 6.
[52] *Id.*

> Twenty minutes before the shooting, a woman who lived only 500-700 feet away from the Wilsons called 911 because she saw someone trying to burglarize a car. The person fled east. Police cars and a helicopter were in the area searching for this suspect when the shooting occurred.
>
> Another woman, Anjalina Cozart, heard police helicopters and cars in the area, looked outside, and saw a man running east through the neighborhood. Cozart was able to describe the clothing of the person she saw, and told the police it wasn't Jeffrey Wilson.
>
> Just two minutes after the shooting, police observed a silver pickup truck leaving the area at a high rate of speed. Police communications identified this person as a suspect in the shooting. A felony stop was conducted, and the unnamed driver was released. The registered owners of the truck both had criminal records and lived just two houses away from the woman who had called 911 about the possible burglary.
>
> A man named James Hoopes lived just four houses away from the Wilsons, was a meth dealer, and had prior convictions for burglary, drugs, and weapons. He also bore a striking resemblance to Jeffrey Wilson. Bill Wilson (Jeffreys' father) knew Hoopes and had an adverse relationship with him. Several other people identified Hoopes as a likely suspect in the shooting. Hoopes also drove a light-colored pickup truck.[53]

Wilson asserts that if he had known about these potential alternate suspects, he would not have entered his *Alford* plea.[54]

Respondents argue that Wilson cannot tie these potential alternate suspects to the crime or establish that the discovered information would have changed his willingness to enter a plea bargain.[55] They assert that counsel did not have a duty to investigate "unrelated criminal activity."[56] Further, respondents contend that Wilson cannot establish prejudice because an

---

[53] *Id.* at 6–7.
[54] *Id.*
[55] ECF No. 41 at 16.
[56] *Id.* at 17.

11

investigation into alternate suspects would not have changed the outcome[57]—an alternate-shooter theory does not refute the evidence identifying Wilson as the shooter.[58]

### A. The Nevada Court of Appeals' decision is entitled to AEDPA deference.

In affirming the denial of Wilson's state habeas petition, the Nevada Court of Appeals held:

> Wilson raised several claims that Cano failed to conduct an adequate investigation. A petitioner claiming counsel did not conduct an adequate investigation must demonstrate what a more thorough investigation would have yielded and how it would have affected his decision to plead guilty. . . . Wilson failed to demonstrate prejudice. He failed to demonstrate by a preponderance of the evidence what the results of further investigation would have been. Moreover, the district court found Wilson's testimony that he would not have entered a guilty plea if Cano had performed further investigation to be not credible.
>
> Wilson also failed to demonstrate Cano was deficient in failing to investigate the evidence. Wilson admitted that the following evidence was not provided to Cano, and Wilson did not allege objectively reasonable counsel would have independently discovered it: Wilson's father's statements to first responders, copies of 911 calls for this crime and an earlier incident elsewhere in the neighborhood, FBI reports, and evidence from the hotel where Wilson was staying at the time of the crimes. And Wilson failed to demonstrate by a preponderance of the evidence that Cano should have been aware of the remaining evidence that Wilson contends he should have investigated.[59] Because Wilson failed to demonstrate deficiency and prejudice, we conclude the district court did not err by denying these claims.[60]

---

[57] ECF No. 41 at 12–14.

[58] Id.

[59] This includes a list of names allegedly prepared by Wilson's girlfriend, ballistics evidence, Wilson's alibi, a pickup truck seen leaving the area after the crime, a potential second shooter, the mental state of a neighbor, discord between the victims and another neighbor, the mechanical soundness of Wilson's van, and a nearby prowling incident occurring about 20 minutes earlier. [footnote in original].

[60] ECF No. 20-34 at 6–7.

12

Wilson contends that although the state appellate court articulated the correct standards under *Strickland* and *Hill*, it incorrectly applied a more stringent preponderance-of-the-evidence standard when evaluating the deficient-performance and prejudice prongs of his claim.[61] Wilson argues that de novo review applies because the state appellate court's decision was contrary to clearly established federal law and based on an unreasonable determination of the facts.[62] I reject Wilson's contention that the state appellate court used the wrong standard of proof. But even on de novo review, Wilson's IAC claim fails.

The Nevada Court of Appeals set forth the standard as follows:

> To demonstrate ineffective assistance of counsel sufficient to invalidate a judgment of conviction based on a guilty plea, a petitioner must show counsel's performance was deficient in that it fell below an objective standard of reasonableness and prejudice resulted in that there was a reasonable probability petitioner would not have entered a guilty plea and would have insisted on going to trial absent counsel's errors. *See Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985); *Kirksey v. State*, 112 Nev. 980, 988, 923 P.2d 1102, 1107 (1996). Both components of the inquiry must be shown. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). The petitioner must demonstrate the underlying facts by a preponderance of the evidence. *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004).[63]

Courts have repeatedly held that litigants seeking to prevail in a collateral proceeding must prove facts of their case by a preponderance of the evidence.[64] Careful review of the Nevada Court of Appeals findings suggests that it applied the preponderance-of-the-evidence standard to the underlying facts presented in support of Wilson's claim, not to its legal

---

[61] ECF No. 46 at 14–15.
[62] *Id*. at 5.
[63] ECF No. 20-34 at 3–4.
[64] *See Holland v. Jackson*, 542 U.S. 649, 655 (2004).

13

conclusions under *Strickland* or *Hill*.[65] The Nevada Court of Appeals' finding that Wilson "failed to demonstrate prejudice" is distinct from the conclusion that he "failed to demonstrate by a preponderance of the evidence what the results of further investigation would have been."[66] Similarly, its finding that Wilson "failed to demonstrate Cano was deficient in failing to investigate the evidence" is distinct from the conclusion that Wilson "failed to demonstrate by a preponderance of the evidence that Cano should have been aware of the remaining evidence that Wilson contends he should have investigated."[67] As explained by the Supreme Court, AEDPA requires that "state-court decisions be given the benefit of the doubt."[68] "Readiness to attribute error is inconsistent with the presumption that state courts know and follow the law."[69]

The Nevada Court of Appeals' conclusion that counsel did not render deficient performance was neither contrary to nor an unreasonable application of clearly established federal law. Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[70] An attorney's "strategic choices made after thorough investigation of law and facts relevant to plausible options are

---

[65] *Id.* at 655 (concluding that a state court's use of the term "probable" in describing the petitioner's burden under *Strickland*, as opposed to the correct standard of "a reasonable probability," did not render the decision "contrary to" federal law where the state court previously recited the correct *Strickland* standard).

[66] ECF No. 20-34 at 6–7.

[67] *Id.*

[68] *See Woodford v. Visciotti*, 537 U.S. 19, 23–24 (2002) (per curiam).

[69] *Id.*

[70] *Strickland*, 466 U.S. at 691.

virtually unchallengeable."[71] And "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."[72]

The Nevada Court of Appeals found that Wilson failed to demonstrate that Cano should have been aware of the evidence that was not discovered through further investigation. Counsel retained a firearms and ballistics expert.[73] He testified at the evidentiary hearing that he had investigators working on the case and that he issued a subpoena for incident call reports, audio recordings, and the radio traffic referring to the event.[74] Counsel further testified that "[t]here were witnesses that had information on the crime that we were trying to locate and couldn't locate."[75] Cano had Wilson evaluated for competency as well as psychiatric issues that could have developed into a defense.[76] Counsel testified that he knew how to advise Wilson on the plea negotiation.[77] According to Cano's testimony, Wilson indicated at their first meeting that he wanted to resolve the case, but he advised his client that they should first "get all the evidence and see what the State has."[78] The Nevada Court of Appeals thus reasonably determined that counsel's performance did not fall "outside the wide range of professionally competent assistance."

In order to prevail on his IAC claim, Wilson must show his trial counsel acted deficiently and "a reasonable probability that, but for counsel's [deficiencies], the result of the proceeding

---

[71] *Id.*
[72] *Id.*
[73] ECF No. 18-24.
[74] ECF No. 20-13 at 21.
[75] *Id.*
[76] *Id.* at 86.
[77] *Id.* at 49–50.
[78] *Id.* at 50.

would have been different."[79] However, the Court need not "address both components of the inquiry" if the petitioner "makes an insufficient showing on one."[80] Although the Nevada Court of Appeals found that Wilson failed to demonstrate both deficiency and resulting prejudice, Wilson has not sufficiently demonstrated that his counsel's "representation fell below an objective standard of reasonableness."[81] Therefore, the *Strickland* inquiry need not continue. Wilson has not demonstrated that the Nevada Court of Appeals' decision was contrary to or involved an unreasonable application of clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts. I therefore deny him federal habeas relief.

### B. Even under de novo review, Wilson's IAC claim fails.

Even if Wilson could get through AEDPA's gate, his claim cannot succeed. On de novo review, Wilson must demonstrate "there is a reasonable probability that, but for counsel's errors, [he] would not have ple[d] guilty and would have insisted on going to trial."[82] On de novo review, I find that Wilson failed to demonstrate prejudice because he cannot demonstrate a reasonable probability that he would have insisted on going to trial as the discovery of the evidence would not have changed the outcome of a trial or led counsel to change his recommendation about the plea.[83]

After the shooting, Wilson's father informed the police that he recently had an argument with Wilson, that "[Wilson] could have done something like this," and that Wilson had access to

---

[79] *Strickland*, 466 U.S. at 694.
[80] *Id.* at 697.
[81] *Id.*
[82] *Hill*, 474 U.S. at 59.
[83] *See id.*

16

the safe where his father stored firearms and ammunition.[84]  Wilson's girlfriend, Bellomy, informed police that an increasingly paranoid Wilson left their hotel room, which was located one mile from his parents' residence, at times consistent with the shooting.[85]  Police recovered a partial frame for a Glock handgun registered to William from an exhaust fan in Wilson's hotel room on the night of the shooting.[86]  Detectives also found ammunition in Wilson's van and storage unit that were of the same caliber and brand as the ammunition found at the scene. Wilson's van was found less than a mile from the scene, and in it, police found a surveillance camera and lens assembly like the one they'd found disabled at the scene.[87]  In addition, a security-system-recording unit missing from Wilson's parents' home was discovered in his storage unit.[88]  Wilson's clothing exhibited evidence of gunfire residue.[89]  Friends of Wilson's parents reported that Wilson's mother was afraid of her son.[90]  Kathryn had asked a friend to hold onto weapons, ammunition, and jewelry to keep them away from Wilson[91] and had begun to lock her office door out of fear that Wilson would harm her at work.[92]  Wilson has not shown

---

[84] ECF No. 20-9 at 42.
[85] *Id*. at 32–33.
[86] *Id*. at 55–56.
[87] *Id*. at 33.
[88] *Id*.
[89] *Id*. at 52.
[90] *Id*. at 52–54.
[91] *Id*
[92] *Id*.

that he would have succeeded at trial under an alternate-shooter theory because such a theory cannot defeat all of this evidence pointing to his guilt.[93]

Wilson also cannot meet his burden to "convince the court that a decision to reject the plea bargain would have been rational under the circumstances," as he must to obtain relief on this type of claim.[94] In exchange for the guilty plea, the State agreed to drop two felony charges—battery with use of a deadly weapon and discharging a firearm at or into structure or vehicle—and to collapse the attempted-murder-with-use-of-a-deadly-weapon charge into one for attempted murder only.[95] Had Wilson rejected the plea agreement and proceeded to trial, he would have faced two additional felony charges and would not have gained the benefit of reduced exposure at sentencing. Wilson failed to demonstrate a reasonable probability that counsel's failure to investigate would cause a rational defendant in Wilson's situation to plead not guilty and go to trial. Because Wilson failed to make a sufficient showing on prejudice, I need not address the deficiency prong. So even on de novo review, I would reach the same result and deny him federal habeas relief.

### C. Certificate of appealability

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability. To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[96] "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must

---

[93] *See Hill*, 474 U.S. at 59 (holding that assessing prejudice in guilty plea cases "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial").

[94] *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).

[95] ECF No. 18-4; ECF No. 18-29; ECF No. 18-30.

[96] 28 U.S.C. § 2253(c).

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[97]  Because I have rejected Wilson's constitutional claims on their merits, and he has not shown that this assessment of his claims is debatable or wrong, I find that a certificate of appealability is unwarranted in this case.

## Conclusion

IT IS THEREFORE ORDERED that Jeffrey Wilson's petition for a writ of habeas corpus **[ECF No. 34] is DENIED**.  And because reasonable jurists would not find my decision to deny his petition to be debatable or wrong, **a certificate of appealability is DENIED**.  The Clerk of the Court is directed to **ENTER JUDGMENT** accordingly and **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
April 5, 2022

---

[97] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).